NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | **Hon. Dennis M. Cavanaugh** |
| IN RE MERCK & CO., INC. VYTORIN ERISA | : | |
| LITIGATION | : | **OPINION** |
| | : | |
| | : | Civil Action No. 08-CV-285 (DMC) |
| THIS DOCUMENT RELATES TO: | : | |
| ALL CASES | : | |
| | : | |
| | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

      This matter comes before the Court upon motion for final approval of class certification and final approval of the proposed Settlement and Release Agreement and by Co-Lead Class Counsel, seeking an award of attorneys' fees and reimbursement of expenses. After considering the submissions of the parties, and based upon the following, it is the decision of this Court for the reasons herein expressed, class certification is **granted** for settlement purposes, approval of the Settlement Agreement and Release is **granted** and the motion to award attorneys' fees and reimbursement of costs is **granted**.

## I.    BACKGROUND

    A.    Factual

      A joint venture arose between Merck & Co., Inc. ("Merck") and Schering-Plough Corporation ("Schering-Plough") (collectively, "Defendants") when Merck's patented drug Zocor was used in combination with another cholesterol lowering drug developed by Schering-Plough, Zetia, to create Vytorin. (Plaintiffs' Complaint ("Pl. Compl."), ¶¶ 4, 8). Vytorin and Zetia, patented by Schering-Plough, are marketed and sold by Merck/Schering-Plough Pharmaceuticals ("MSP").

The Food and Drug Administration ("FDA") approved each drug for the lowering of LDL (or "bad") cholesterol. (See Pl. Compl., ¶¶ 5, 7). Vytorin, however, was not approved for the reduction of heart disease. (Pl. Compl., ¶ 10). Plaintiffs' Master Complaint asserts that Vytorin was marketed as the new and improved Zocor and as effective in reducing cholesterol along with arterial plaque, known to cause heart attacks and other adverse cardiac conditions. (Pl. Compl., ¶¶ 9, 11).

In 2002, a study was performed called "Effect of Combination Exetimibe [sic] and High-Dose Simvastatin v. Simvastatin Alone on the Atherosclerotic Process in Patients with Heterozygous Familial Hypercholestorolemia." ("ENHANCE"). (Pl. Compl., ¶ 12). Zetia contains ezetimibe alone while Vytorin consists of both ezetimibe and simvastatin. The Master Complaint asserts that the purpose of the study was to prove that "Vytorin's combination of Zetia and Zocor stops or reduces the growth of fatty arterial plaque better than Zocor alone." (Pl. Compl., ¶ 12). However, the study concluded not only that Vytorin was "less effective in reducing arterial plaque build-up than Zocor, but also that Vytorin posed serious safety concerns." (Pl. Compl., ¶ 13). Plaintiffs allege that Defendants had financial incentive to and actively sought to conceal the results of this study until January 14, 2008. (Pl. Compl., ¶ 14-16).

Specifically, Merck's 2006 and 2007 10K Forms reveal global Vytorin sales for 2004, 2005, 2006 and 2007 at $132.4 million, $1.028 billion, $1.995 billion and $2.779 billion, respectively. (Pl. Compl., ¶ 15). With respect to Zetia, global sales in those same years were respectively, $1.053 billion, 1,379 [sic] billion, $1.929 billion and $2.407 billion. (Pl. Compl., ¶ 15). Further, Vytorin and Zetia are alleged to account for 60%-70% of Schering-Plough's earnings per share. (Pl. Compl., ¶ 15).

Plaintiffs' core allegations concerning deceptive advertising and concealment are disputed

by Defendants. Defendants contend that drug advertising and promotion was consistent with product labeling as approved by the FDA. Further, Defendants contend that the ENHANCE study involved a small group of patients afflicted with a preexisting condition only affecting 0.2 percent of the population and as a result, the findings cannot be extrapolated to the population of Vytorin and Zetia purchasers as a whole. Indeed, Defendants assert that the ENHANCE study demonstrates reductions in LDL. Finally, Defendants suggest that problems with the quality of digital images generated during the study delayed the release of the study results.

B.      Procedural

Plaintiffs filed an initial complaint in this multi-district matter on January 15, 2008. On April 8, 2008, the Judicial Panel on Multi-district Litigation centralized all federal litigation involving Vytorin and Zetia before this Court. By way of case management order, entered by this Court on June 4, 2008, an organizational structure consisting of a Plaintiffs' Steering Committee, an Executive Committee of Plaintiffs' Steering Committee, Consumer Liaison to Executive Committee and appointment of Co-Liaison Counsel was instituted. The present litigation consists of more than 140 putative class actions seeking certification of nationwide and state-wide classes on behalf of consumers and third party payors ("TPPs").

An Amended and Proposed Class Action Master Complaint ("Master Complaint") was filed on September 25, 2008. The Master Complaint asserts legal and equitable claims pursuant to statutory and state law. By way of response, Defendants filed a motion to dismiss the Master Complaint on December 8, 2008. This motion was later stayed pending the outcome of settlement negotiations instituted in May 2009.  A motion for preliminary approval of settlement was filed on September 8, 2009. On September 17, 2009, this Court entered an order granting preliminary

approval of settlement, preliminary class certification and approving class notice. On February 3, 2010, a motion for final settlement approval was filed.  On February 8, 2010, a fairness hearing concerning the settlement was held before this Court.

Pursuant to the arms length settlement negotiations beginning in 2009, the proposed settlement agreement identifies a Master Class and two Subclasses. The Master Class includes:

> [a]ll individuals and entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed, used and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. For purposes of the Class definition, individuals and entities "purchased" VYTORIN or ZETIA if they paid or made a co-payment for some or all of the purchase amount.

The Consumer Subclass includes:

> [a]ll individual persons in the United States and its territories who, for purposes other than resale, purchased, reimbursed, used and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. For purposes of the Subclass definition, individuals "purchased" VYTORIN or ZETIA if they paid or made a co-payment pursuant to the terms of a health insurance plan, for some or all of the purchase amount.

The Third Party-Payor Subclass includes:

> [a]ll entities in the United States and its territories that, for purposes other than resale, purchased, reimbursed and/or paid for VYTORIN or ZETIA during the period from November 1, 2002 through [September 17, 2009]. Such entities include, but are not limited to, all self-funded employer plans, private insurance providers, managed care organization, insurance companies, employee benefit plans, health and welfare funds, union plans, workers compensation entities, HMOs, PPOs, entities with self-funded plans, and any other entity who is a party to a contract, issuer of policy, or sponsor of a plan, and is at risk, under such policy, contract, or plan, to pay or reimburse all or part of the cost of prescription drugs dispensed to covered natural persons.[1]

---

[1]

A separate settlement agreement has been entered into with a group of independently represented health plans ("IRHPs"), conferring an award of $14.525 million on members of that subclass.

Thirty percent (30%) of the total settlement or $12.45 million dollars has been allocated to pay consumer subclass members. The remaining seventy percent (70%) has been allocated between TPPs and IRHPs, each initially receiving $14.525 million. The allocation plan does not permit "spillovers." That is, amounts paid to consumers will not be used to satisfy claims of TPPs or IRHPs.

## II.    LEGAL STANDARD

### A. SETTLEMENT PLAN AND ALLOCATION

#### 1.    Satisfaction of Rule 23 Criteria for Class Certification

The Court must certify the Master Class and Subclasses pursuant to the requirements of Federal Rule of Civil Procedure 23(a) and (b).  See Anchem Prod., Inc. v. Windsor, 521 U.S. 621-22 (1997).  In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration.  See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 308 (3d Cir. 1998) cert denied, 525 U.S. 1114 (1999).

##### i.    Rule 23(a) Requirements

To certify a class, Rule 23(a) requires that there be numerosity, commonality, typicality and adequacy of representation. Fed. R. Civ. P. 23(a). Here, the numerosity requirement is met given that the multi-district action accounts for over 140 putative class actions and includes over 100 Plaintiffs in the constituent actions. Further, at the hearing before this Court, parties projected that the prospective class of Plaintiffs could range anywhere from 10,000 members to 100,000 members. Joinder of this many Plaintiffs is clearly not feasible. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

Commonality exists because there are common questions of law and fact. Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Plaintiffs' claims arise from a common nucleus

of operative facts, namely, Defendants' alleged deceptive business practices in marketing the drugs while allegedly suppressing the results of the ENHANCE study. Furthermore, there is commonality among the questions of law raised because the same core legal and equitable claims apply to all Plaintiffs, including claims asserted pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the New Jersey Consumer Fraud Act.

Typicality is satisfied so long as the interests of all plaintiffs are "aligned." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004). So long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is usually established regardless of factual differences." Newton v. Merrill Lynch Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183-84 (3d Cir. 2001). Specifically, the claims of the Lead Plaintiffs and of the Class arise from the same alleged deceptive business practices by Defendants and therefore, their interests are properly aligned.

"The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." Georgine v. Amchem Products, 83 F.3d 610, 630 (3d Cir. 1996) (internal citation omitted). "This component includes an inquiry into potential conflicts among various members of the class because the named plaintiffs' interests cannot align with those of absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class." Id. While Plaintiffs acknowledge a potential disparity given that some Plaintiffs are consumers and some are TTPs, Plaintiffs assert any potential conflict that may have arisen has been remedied with the implementation of separate subclasses, individually representing any unique interests of consumers

and any unique interests of TTPs. Nonetheless, the overarching interests are aligned as outlined above.  Further, any unnamed Plaintiffs are likely to fall under one of the subclasses and therefore, those potential Plaintiffs interests are adequately represented.  The adequacy component also requires that Plaintiffs be represented by qualified counsel. The firms representing Plaintiffs are known nationally and well reputed with a focus in class action and multi-district litigation.  Therefore, the requirement of adequate representation is satisfied.

For these reasons, the requirements of 23(a) for class certification are satisfied in this case.

ii.    Rule 23(b) Requirements

Next, the Court must find that the class fits within one of the three categories of class actions set forth in Fed. R. Civ. P. 23(b).  In a case where money damages predominate, class certification is appropriate where common questions predominate and class resolution is the superior method for the fair and efficient adjudication of the controversy.  As discussed above, common questions of fact and law predominate in this case.  Furthermore, for purposes of Rule 23(b), these "questions of law or fact common to members of the Class predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Specifically, each Class Member's claims depend upon resolution of the same factual and legal questions regarding the Defendants' alleged deceptive business practices with respect to the efficacy and safety of a drug.  See Warfarin,  391 F.3d at 528; In re Cmty. Bank of N. Virginia, 418 F.3d 277, 309 (3d Cir. 2005) (cases where Third Circuit found the predominance requirement satisfied because the claims arose from Defendants' same fraudulent scheme).

Even though the laws of various states differ as to the claims raised by these multi-district Plaintiffs, this Court still finds that there is Rule 23(b) predominance.  The Third Circuit has noted

that "the same concerns with regards to case manageability that arise with litigation Classes are not present with Settlement Classes, and thus these variations [in state laws] are irrelevant to certification of a settlement class." <u>Warfarin</u>, 391 F.3d at 529.  Furthermore, the same common issues regarding Defendants' business practices still lie at the core of Class Members' claims.

Finally, it is clear that approving the settlement is a superior method of resolving these claims. Approving this Settlement Agreement is a more efficient and less risky means of addressing Class Members' grievances.

Based on the foregoing, the proposed Settlement Class is certified pursuant to Rule 23(b)(3).

### 2.    Satisfaction of Rule 23(e) Standard

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed. R. Civ. P. 23(e).  In determining whether to approve a class action settlement pursuant to Rule 23(e), "'the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members'" <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.</u>, 55 F.3d 768, 785 (3d Cir.1995) (quoting <u>Grunin v. Int'l House of Pancakes</u>, 513 F.2d 114, 123 (8th Cir. 1975), <u>cert</u>. <u>denied</u>,423 U.S. 864 (1975) (citation omitted)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable."  <u>Lazy Oil Co. v. Witco Corp.</u>, 166 F.3d 581, 588 (3d Cir. 1999); <u>Walsh v. Great Atl. & Pac. Tea Co.</u>, 726 F.2d 956, 965 (3d Cir.1983).  In <u>Girsh v. Jepson</u>, the Third Circuit identified nine factors, so-called "<u>Girsh</u> factors," that a district court should consider when making this determination:

(1)     the complexity, expense and likely duration of the litigation;
(2)     the reaction of the class to the settlement;
(3)     the stage of the proceedings and the amount of discovery completed;
(4)     the risks of establishing liability;
(5)     the risks of establishing damages;
(6)     the risks of maintaining the class action through the trial;
(7)     the ability of the defendants to withstand a greater judgment;
(8)     the range of reasonableness of the settlement fund in light of the best possible recovery;
(9)     the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975).  "These factors are a guide and the absence of one or more does not automatically render the settlement unfair."  In re American Family Enterprises, 256 B.R. 377, 418 (D.N.J. 2000).  Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under Girsh.  See In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 184 (E.D.Pa.1997); see also In re AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006).[2]  In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the Girsh factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by

---

[2]

District courts should also consider other relevant and appropriate factors.  The court in Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions), suggested that district courts may consider "the maturity of the underlying substantive issues . . . the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages . . . whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable."  148 F.3d 283, 323 (3d Cir. 1998).

the same standards of review applicable to approval of the settlement as a whole: the distribution plan

must be fair, reasonable and adequate." Karcich v. Stuart (In re Ikon Office Solutions, Inc., Sec.

Litig.), 194 F.R.D. 166, 184 (E.D. Pa. 2000) (citations and internal quotations omitted); see also

Walsh v. Great Atlantic & Pacific Tea Co., 726 F.2d 956, 964 (3d Cir. 1983) ("The Court's principal

obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in

the fund.").

### B. JUDICIAL APPROVAL OF ATTORNEYS' FEES

The awarding of fees is within the discretion of the court, so long as the court employs the

proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly

erroneous. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 727 (3d Cir. 2001).  Notwithstanding

this deferential standard, a district court is required to clearly articulate the reasons that support its

conclusion.  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 301 (3d Cir. 2005).  The Third Circuit

Court of Appeals identified several factors–the Gunter factors–that a district court should consider.

These factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence
> or absence of substantial objections by members of the class to the settlement terms
> and/or fees requested by counsel; (3) the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; and
> (7) the awards in similar cases.

Rite Aid, 396 F.3d at 301 (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d

Cir. 2000)).  The Third Circuit identified three additional factors that apply in percentage of fee

awards, including:

> (8) the value of benefits attributable to the efforts of class counsel relative to the efforts

of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

In re Diet Drugs (Phentermine/Flenfuramine/Dexflenfuramine) Products Liab. Litig., 582 F.3d 524, 541 (3d Cir. 2009)

The Court need not apply these fee award factors in a formulaic way.  Certain factors may be afforded more weight than others.  Rite Aid, 396 F.3d at 301.  The Third Circuit emphasized in Rite Aid, however, that the district court must engage in a robust assessment of these factors.  396 F.3d at 302; see also Gunter, 223 F.3d at 196 (vacating district court's ruling because the fee-award issue was resolved in a cursory and conclusory fashion). While the Third Circuit has not adopted a particular standard for fee awards in common fund cases, the Third Circuit acknowledges that fee awards generally range from 19% to 45%.  In re General Motors Corp. Pickup Fuel Tank Products Liability Litigation, 55 F.3d 768, 822 (3d Cir. 1995).

**III.  DISCUSSION**

**A.  SETTLEMENT PLAN AND ALLOCATION - APPLICATION OF THE GIRSH FACTORS**

The Court will consider the proposed settlement in light of the Girsh factors. The balance of factors, here, weighs in favor of approval.

**1. Complexity, Expense and Likely Duration of Litigation**

This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation." In re Cendant Corp. Litig., 264 F.3d 201, 234 (3d Cir. 2001). This litigation has been ongoing for more than two years. Undoubtedly, without settlement, the continued costs and time required to proceed through discovery, pre-trial matters, trial and post-trial matters would be great in

11

this multi-district action.

Additionally, there will necessarily be significant delay in recovery if this case is tried. See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004); Weiss v. Mercedes-Benz of N. Am., Inc., 899 F. Supp. 1297, 1301 (D.N.J. 1995). In contrast, the settlement provides immediate recovery of more than $40 million dollars, less attorneys' fees and expenses. The first Girsh factor weighs in favor of approving the settlement.

### 2. Reaction of Class to Settlement

_____This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable. The Court also notes that the second Girsh factor is especially critical to its fairness analysis, as the reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy." Sala v. National R.R. Passenger Corp., 721 F. Supp. 80, 83 (E.D. Pa. 1989); Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liab. Litig.), 176 F.R.D. 158, 185 (E.D. Pa. 1997) (stating that a "relatively low objection rate militates strongly in favor of approval of the settlement" (internal citations omitted)).[3]

---

[3] Originally, Blue Cross Blue Shield of Alabama and Michigan filed objections, including a typographical error objection, an inequitable distribution of the fund objection, and overly broad language objection to Article XXII, which subsequently were resolved and withdrawn.  By way of Stipulation, dated February 3, 2010, these objections were resolved.  Class Members Sam A. Cannata and Dennis P. Levin originally filed objections and subsequently, withdrew those objections raised with respect to attorneys' fees., contingent upon a reduction in reimbursement costs. In withdrawing the original objections, the counsel for Cannata and Levin represent to the Court that the Class Counsel has agreed to "reduce its request for reimbursement of expenses by the amount of Fifty-Five thousand dollars ($55,000) representing a portion of the amount claimed for Internet Research and Internal Copying Expenses." The reduction was applied to an original reimbursement request of $196,186.00 that is now a request for $141,186.00.  Further, it is represented that a reasonable fee is to be paid from the Class Counsel fee award to the Objectors' Counsel, consisting of a group of four law firms. Assuming, without concluding, all parties agree, the motion to withdraw the former objections is granted.  Lastly, it has been represented to this Court by Class Counsel that an objection by Consumer

Few objections have been raised. As stated on the record, before this Court, all objections have been resolved and withdrawn. Therefore, this factor weighs strongly in favor of settlement.

### 3. Stage of Proceedings and Amount of Discovery Completed

Pursuant to the third Girsh factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. GMC Pick-Up Truck, 55 F.3d at 813; see also Prudential, 148 F.3d at 319. In short, under this factor the Court considers whether the of amount of discovery completed in the case has permitted "counsel [to have] an adequate appreciation of the merits of the case before negotiating." Prudential, 148 F.3d at 319; See also AT&T, 455 F.3d at 167 (noting extent of discovery).

Class counsel has reviewed in excess of 1.2 million documents pertaining to Defendants' marketing practices, Defendants' interaction with governmental agencies, circumstances surrounding the ENHANCE study as well as other clinical and regulatory documents. Additionally, Class Counsel has conducted informal discovery, obtained information from named Plaintiffs in this matter, consulted expert witnesses, retained private investigators and prepared relevant legal documents in response to a motion to dismiss filed before this Court. It is clear that Class Counsel had an adequate appreciation of the facts in this matter before proceeding with settlement negotiations. This factor weighs in favor of settlement approval.

### 4. Risks of Establishing Liability

A trial on the merits always entails considerable risk. Weiss, 899 F. Supp. at 1301. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards

---

Class Member, Ellis Eisen, Esq. has been withdrawn.

(or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 814 (3d Cir. 1995).

Risk is inherent in litigation. In this case, the risks of litigation are great because Plaintiffs' claims involve complex and contested questions of law and fact. Previously, Defendants filed a motion to dismiss the Master Complaint demonstrating that, in the absence of settlement, Defendants will continue to zealously advocate in defense of their products. Further, at the fairness hearing conducted before this Court, Defendants reasserted their belief that this motion would be otherwise meritorious in the absence of settlement, citing a number of cases in support of that motion. Although Plaintiffs assert that their claims are legally sound, indeed, they acknowledge that FDA statements in support of the efficacy of Defendants' drugs pose a level of risk. Therefore, this factor weighs in favor of settlement approval.

     5. Risks of Establishing Damages

The fifth Girsh factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." GMC, 55 F.3d at 816. Ultimately, a battle of experts will ensue presenting differing damages calculations and "[a] jury would therefore be faced with competing expert opinions representing very different damage estimates . . . adding further uncertainty." In re Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 506 (W.D. Pa. 2003). Even if Plaintiffs successfully established causation at trial, post-trial motions and appeals present added risk. In re Apollo Group, Inc. Sec. Litig., 2008 U.S. Dist. LEXIS 61995, at *1-4 (D. Ariz. Aug. 4, 2008) (granting Rule 50(b) motion, following lengthy trial, notwithstanding the $280 million jury verdict). This uncertainty of the final damage award along with the attendant risk of successfully establishing damages weighs in

favor of settlement approval.

### 6. Ability of Defendants to Maintain Class Certification Through Trial

The standard for certification is the same for settlement classes as it is for conventional classes. GMC, 55 F.3d at 817. "Rule 23(b) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards." Id. Further, certain issues such as damages can be tried on an individual basis. Id. If certification is precluded, alternatives, such as multi-district litigation, exist helping to retain some of the substantive advantages of class certification. Id.

Plaintiffs present a compelling argument that if the class is not certified here, then few if any members of the litigation will have financial incentive or actual means to proceed in individual suits. Further, Plaintiffs argue that settlement class certification eliminates some of the other hurdles present in class action litigation, including conflict or choice of law issues, manageability issues and concerns with respect to injury and causation elements of individual claimants. Given Plaintiffs' recognition of the particular issues that arise with respect to class certification for purposes of litigation, it seems that this factor weighs in favor settlement approval.

### 7. Ability of Defendants to Withstand a Greater Judgment

To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate whether Defendants could withstand a judgment much greater than the amount of the settlement. See Cendant, 264 F.3d at 240; Prudential, 148 F.3d at 321-22; GMC, 55 F.3d at 818. While Plaintiffs recognize that Defendants potentially have resources to withstand a greater judgment, this factor is not dispositive. See GMC, 55 F.3d at 818. Given that Defendants' global sales are reported in the billions of dollars, there is strong indication that Defendants can potentially withstand a greater

15

judgment. This factor does not weigh in favor of settlement approval.

        8/9. <u>Reasonableness of the Settlement Fund in Light of the Best Possible Recovery,</u>

        <u>and in Light of the Attendant Risks of Litigation</u>

_____ "According to Girsh, courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor)." <u>GMC</u>, 55 F.3d at 806. Neither party presents the Court with an estimate of prospective recovery. if the litigation concluded with a successful result for Plaintiffs. Assuming, without concluding, that Plaintiffs would prevail at trial, then it appears that recovery would prove substantial in light of the billions of dollars grossed from global sales. Although a concrete estimate would enable the Court to conduct a more refined analysis, the potential costs of continued litigation along with potential recovery favors settlement, especially by way of comparison to settlement recovery in the amount of $41.5 million dollars.

    **B.**    **ATTORNEYS' FEES**

        1. <u>The Gunter/Prudential Factors</u>

Consideration of the Gunter factors weighs in favor of the reasonableness of the attorneys' fees in this common fund class action settlement. Co-Lead Class Counsel seeks $33^{1/3}$ % of the value of the Settlement as fees, totaling $13,819,500.00, plus $141,186.00 as reimbursement for the expenses and costs actually incurred.

First, courts consider the size of the fund created and the number of persons benefitted by the settlement. "As a general rule, as the size of the fund increases, the appropriate percentage to be awarded to counsel decreases." <u>Chemi v. Champion Mortgage</u>, 2009 U.S. Dist. LEXIS 44860, *31

(D.N.J. May 26, 2009) (citing In re Cendant Corp., 232 F. Supp. 2d 327, 337 (D.N.J. 2002)). "This rule is based on the premise that, 'in many instances[,] the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" Id. The Third Circuit appears to recognize, or at least, implicitly endorse recognition of, $100,000,000.00 as a benchmark of a large settlement. Id. (citing Welch & Forbes, Inc. v. Cendant Corp., 243 F.3d 722, 736-37 n.19 (3d Cir. 2001)).

In the instant case, the settlement value is by no means insubstantial, totaling $41,500,000.00. However, the benefit conferred is not so large that recovery dictates a reduction in the percentage of fee recovered in accordance with the purported Third Circuit benchmark. The number of class members is large, at least consisting of Plaintiffs IBEW Local 164 Welfare Fund, Fire & Police Retiree Health Care Fund of San Antonio, Government Employees Health Association, Inc., Pipefitters Local 537 Trust Fund, Teamsters Healthcare, Midwestern Teamsters Health & Welfare Fund, UFCW & Employers Arizona Health & Welfare Trust, County of Nassau, Louisiana Health Insurance Indemnity Company d/b/a BlueCross BlueShield of Louisiana, Helen Aronis, Kenneth Bever, Glenda Morgan, Roy Cosgrove, Charles Miller, Anna Iannuzzi, Robert Mastondrea, Robert Love, Donald Varino, Frances Weiland, and Daniel Tollefson, on behalf of themselves and all others similarly situated. Therefore, the size of the fund and number of persons benefitted by the fund weighs in favor of an award of attorneys' fees.

Second, the Court evaluates the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel. Substantive objections raised by class members Blue Cross Blue Shield ("BCBS") of Alabama and BCBS of Michigan, in their individual capacities and as TTP class representatives, have been resolved by way of stipulation

entered into the docket on February 3, 2010. Reimbursement cost objections raised by individual consumer class members Sam A. Cannata and Dennis P. Levin were also withdrawn pursuant a reduction in reimbursement expenses as reflected in the recent motion also before this Court seeking final seeking class certification and final settlement approval. [4]

Mahzer Jaweed ("Dr. Jaweed"), absent from the Court hearing earlier this day, filed a request for clarification. Pursuant to that request, Dr. Jaweed documents an emergent admission to the hospital where he was informed that he was suffering from cancer and was told to stop taking Vytorin, "the offending agent" which had prompted the admission. Dr. Jaweed expresses concern that despite that grave personal injury incurred, he will not be able to demonstrate a causal connection between cancer and Vytorin in the absence of medical research supporting a linkage. Although the Settlement Agreement and Release does not release damage claims for personal injury, there is no indication that Defendants will not seek to assert a defense of statute of limitations, laches or estoppel even if a linkage is later discovered. Dr. Jaweed seeks clarification that nothing in the settlement will preclude a suit by Dr. Jaweed "should a causal connection between and Vytorin/Zetia be discovered, and that the statute of limitations clock did not begin to run at that time." Unfortunately, and with all due respect, the Court is not in a position to address or propose amendment to the settlement agreement based on the emergence of hypothetical research. Indeed, this concern appears to center around a personal injury claim otherwise excluded from the present settlement agreement. Therefore, settlement is not precluded on this ground.  Therefore, an absence of objections favors settlement.

Third, the skill and efficiency of the attorneys involved is high. Class Counsel are highly

---

[4]

Ellis Eisen, Esq., a Consumer Class Member and formerly an objector to the instant settlement agreement, through Class Counsel has represented to this Court that the previous objection filed has been resolved and withdrawn.

skilled attorneys with substantial experience in class action litigation, particularly mass tort and multi-district litigation, as illustrated by firm biographies and the Declarations of Counsel accompanying their fee application. Therefore, this factor favors an award of attorneys' fees.

Fourth, multi-district class action litigation is inherently complex, involving classes of persons from multiple states and consolidation of cases from multiple districts. Beyond the obvious complexity and consequent demand of multi-district suits, this litigation has been ongoing for more than two years to date. The prospective duration of this matter if the does settle accompanied with the constant attention to detail required by an inherently complex suit favors the award of attorneys' fees.

Fifth, "[c]lass Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award." In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 281 (3d Cir. 2009). The risk of non-payment appears substantial given expense of unreimbursable out-of-pocket costs and the 8,199.48 uncompensated hours dedicated to this matter. In the absence of a settlement, the fee awarded is contingent upon prevailing at trial. If a jury were to find in favor of Defendants that the FDA approval of these allegedly defective drugs negates the claims of alleged deceptive advertising, potentially, Co-Lead Counsel would recover nothing and lose more than $5 million dollars invested in this case. Further, although Plaintiffs may prevail at trial, "even a victory at trial is not a guarantee of ultimate success." In re Warner Communications Sec. Litigation, 618 F.Supp. 735, 748 (S.D.N.Y. 1985). "If plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." Id. at 748. "The attorneys' contingent fee risk is an important factor in determining the fee award." Id. at 747. The risk of little to no recovery weighs in favor of

an award of attorneys' fees.

Sixth, the Executive Committee Members have expended 8,199.48 hours and incurred more than $141,186.00 in out-of-pocket expenses, including time and money expended pursuant to an initial investigation, legal research and preparation of relevant legal matters, including instituting a national class notice plan and the attendant procedures required to implement such a plan. Moreover, the time dedicated and expenditures incurred do not include costs that will arise immediately in the future, such as the settlement hearing conducted before this Court on February 8, 2010.

Seventh, awards in similar common fund cases appear analogous to the present request. In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 U.S. Dist. LEXIS 27013, at *44 (D.N.J. Nov. 9, 2005) (not for publication) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that turns out to be one-third") (internal citations omitted); General Motors, 55 F.3d at 822 (in common fund cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"). Given that the award requested appears consistent with other similar cases, this factor weighs in favor of an award of attorneys' fees.

Eighth, the Court must assess "whether Class Counsel had benefitted from 'the efforts of other groups, such as government agencies conducting investigations[.]'" In re Diet Drugs, 582 F.3d at 544 (citing In re AT&T Corp., 455 F.3d 160 (3d Cir. 2006)). Indeed the former FDA approval of these drugs created a hurdle in the present litigation, rather than a benefit. However, there is a corresponding case presently pending before this Court, In re Merck & Co., Inc. Vytorin ERISA Litigation 08-CV-1974, which may have afforded some collateral, but indirect benefits to the present matter. Nonetheless, this factor favors an award despite the effect of any collateral benefits arising from the co-pending case because such effects appear insubstantial by way of comparison to the

20

efforts contributed by Co-Lead Class Counsel in the face of the obstacles presented by this multi-district litigation.

Ninth, the $33^{1/3}$ % fee award requested reflects commonly negotiated fees in the private marketplace. Remeron, 2005 U.S. Dist. LEXIS 27013, at*46 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation."); Karcich, 194 F.R.D. at 194 ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery"). Accordingly, this commonality favors an award of attorneys' fees.

Tenth, although the settlement may contain innovative terms, none have been underscored with respect to the instant matter.  Therefore, this factor neither weighs in favor nor detracts from a decision to award attorneys' fees.

2. Lodestar Cross-check

In addition to assessing the Gunter factors, courts in this circuit confirm the reasonableness of a fee by using the lodestar calculation method when a fee award is based on percentage of recovery. See Rite Aid, 396 F.3d at 305-306. The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Id.  "The reasonableness of the requested fee can be assessed by calculating the lodestar multiplier, which is equal to the proposed fee award divided by the lodestar (i.e., the product of the total hours and the blended billing rate). But the lodestar 'multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award.'" In re Ins. Brokerage Antitrust Litig., 579 F.3d at 280.

21

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier. 'The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work.'" In re Diet Drugs, 582 F.3d at 540 n.33. The common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.'" Id. at 540 (citing In re Cendant Corp. Sec. Litig., 404 F.3d 173, 187 (3d Cir. 2005) (internal citation omitted))."When calculating attorneys' fees in such cases, the percentage-of-recovery method is generally favored." Id. (citing Prudential, 148 F.3d at 333).

In support of the lodestar calculation, Co-Lead Class Counsel provided charts detailing the hours worked and billing rates for each attorney and paralegal or support staff who worked on this matter. Class Counsel have expended a total of 8,199.48 hours in this litigation with a total lodestar in the amount of $4,958,945.50 and unreimbursable expenses at a rate of $141,186.00.

Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., formerly Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, reports an expenditure of 2,567.10 hours with a total lodestar of $1,452,562.50 and $35,587.99 in unreimbursable expenses. The hourly attorney billing rate presented ranges from $500.00-$750.00 (non-weighted average = $625.00) at a total of 2,312.1 hours, representing 0.90066 or 90% of the hours expended. The hourly paralegal and/or professional support staff rate is documented as $105.00 at a total of 187.5 hours, representing 0.000327 or .0327% of the hours expended.

Wolf Haldenstein Adler Freeman & Herz LLC reported an expenditure of 1,583.8 hours with a total lodestar of $920,059.00 and $52,904.02 in unreimbursable expenses. The hourly attorney

22

billing presented ranges from $320.00-$835.00 (non-weighted average = $577.50) at a total of 1,464.4 hours, representing 0.92461 or 92.46% of the hours expended. The hourly paralegal and/or professional support staff rate ranges from $85.00-$255.00 (non-weighted average = $170.00) at a total of 119.4 hours, representing 0.000631 or .0631% of hours expended.

Seeger Weiss LLP reports an expenditure of 1,875.3 hours with a lodestar of $1,308,614.00 and $29,767.19 in unreimbursable expenses. The hourly attorney billing rate presented ranges from $345.00-$775.00 (non-weighted average $560.00) with a total of 1,840 hours, representing 0.981176 or 98.11% of hours expended. The hourly paralegal and/or professional support staff rate ranges from $165.00-$225.00 (non-weighted average = $195.00) at a total of 35.3 hours.

Hagan Berman Sobol Shapiro LLP reports an expenditure of 1,026.98 hours with a total lodestar of $354,900.50 and unreimbursable expenses in the amount of $28,436.09. The hourly attorney billing rate presented ranges from $250.00-$650.00 (non-weighted average $450.00) with a total of 551.78 hours, representing 0.537284 or 53.72% of hours expended. The hourly paralegal and/or professional support staff is documented as $150.00 at a total of 475.2 hours, representing 0.462715 or 46.27%.

Lieff, Cabraser, Heimann & Bernstein, LLP reports an expenditure of 1,174.8 hours with a lodestar of $748,569.00 and $46,247.05 in unreimbursable expenses. The hourly attorney billing rate presented ranges from $250.00-$825.00 (non-weighted average $537.50) with a total of 1,077 hours, representing 0.916751 or 91.67% of or of hours expended. The hourly paralegal and/or professional support staff ranges from $175.00-$250.00 (non-weighted average = $212.50) at a total of 97.8 hours, representing 0.083248 or 8.32%.

The fee requested requires a multiplier of approximately 2.786 based on the lodestar presented

to the Court by the Co-Lead Class Counsel. Generally, "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (internal quotation and citation omitted). In re Diet Drugs, 582 F.3d at 545 n.41. Upon review of the hourly wage charts submitted and the lodestar presented by Co-Lead Counsel, for purposes of a cross-check, this Court concludes that the fees requested, with a multiplier of 2.786 is reasonable under the circumstances and awards the fees as requested. Additionally, the Court acknowledges that the fee secured is entirely attributable to the efforts of Counsel.

　　　　3.  Costs

　　　　The Court also finds that Class Counsel is entitled to receive costs, as they have been "adequately documented and reasonably and appropriately incurred in the prosecution of the case." See In re Cendant Corp., 232 F. Supp. 2d at 343 (quoting In re Safety Components Int'l, Inc., 166 F. Supp. 2d 72, 104 (D.N.J. 2001)). Class Counsel has provided itemized expenditures, and has certified that full documentation of the costs have been maintained in the firms' records. Class counsel is awarded reimbursement costs in the requested amount of $141,186.00.

　　　　Class counsel also seeks permission to pay incentive fees to the representative Plaintiffs. It is not uncommon to award such fees. See, e.g., Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quoting In re S. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997)) ("[C]ourts routinely approve incentive awards to compensate named plaintiffs for services they provided and the risks they incurred during the course of the class action litigation."). The Court grants permission to award incentive fees.

**IV.**     **Conclusion**

In accordance with the foregoing, the Court certifies the Master Class and Subclasses for settlement purposes, approves the proposed Settlement Agreement and Release and awards the fees requested by Co-Lead Class Counsel.

                                                              **S/ Dennis M. Cavanaugh**
                                                              Dennis M. Cavanaugh, U.S.D.J.

Dated:          February    9  ,  2010
Original:       Clerk
cc:             All Counsel of Record
                Hon. Mark Falk, U.S.M.J.
                File